UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTO INSPECTION
SERVICES, INC.

      CASE NO. 06-15100
   Plaintiff,      HON. LAWRENCE P. ZATKOFF

v.

FLINT AUTO AUCTION, INC., PRIORITY
INSPECTION, INC., INVISO, INC.,
JOHN LUCE, WILLIAM WILLIAMS, JR.,
ANGIE COMPTON, LAWRENCE CUBIT,
KENNETH J. MOFFITT, SCOTT BRALEY,
and JOHN DOES 1-10,

   Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on December 4, 2006

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is presently before the Court upon Plaintiff's Motion for a Preliminary Injunction. The preliminary injunction hearing was held on November 30, 2006. For the reasons set forth below, Plaintiff's motion will be DENIED.

**II. BACKGROUND**

**A. The Parties and Events Leading to the Present Dispute**

Plaintiff Auto Inspection Services, Inc. ("AIS"), developed automotive inspection software ("the Program") that is utilized as a uniform method of inspecting vehicles after the term of lease

or use has expired. In March 2004, AIS registered the Program with the United States Copyright Office, and currently owns the copyright for the Program. In order to protect against unauthorized use of the Program, AIS included a quality control feature as part of the software, which allowed it to monitor all information collected using the Program. For example, when an vehicle inspector collected data of a vehicle and entered it into the Program, the data had to be sent to AIS for quality control inspection before the information could be forwarded to the owner of the vehicle. In this way, AIS could monitor who was using the Program to protect against unauthorized use.

Defendants Flint Auto Auction, Inc., Inviso, Inc., and Priority Inspections, Inc. (collectively "FAA") are also in the auto inspection business. FAA began designing and programming its own automotive software in 1990, including three separate inspection programs, using both an in-house computer staff and outside firms such as Technical Edge. Prior to the 1990s, FAA's primary clients consisted of automotive dealers who participated in dealer auctions at FAA's facility in Flint. Eventually, FAA attracted larger clients such as General Motors and GMAC.

GMAC, as part of its business of reselling cars at the end of their leases, began using the internet to conduct sales, making inspections a critical element in the business. GMAC approached FAA to conduct these inspections in the summer of 2003, and suggested that FAA use AIS's inspection software. GMAC had previously approved AIS's software, which it required to contain uniform elements and provided detailed instructions for writing the software. Such instructions were necessary for uniformity in GMAC's inspections. Consequently, the inspectors GMAC dealt with, such as FAA and AIS, used software that was substantially similar. Further, GMAC requires that the inspection software be continuously updated in order to continue conducting inspections for GMAC. The next update is December 1, 2006, the day after the hearing.

On October 27, 2003, FAA and AIS entered into a non-exclusive licensing agreement in which AIS permitted FAA to make use of the Program while performing inspections for GMAC. AIS loaded the software directly on to Panasonic Toughbook computers and provided the computers to FAA. AIS reserved the right to terminate the agreement and require the return or destruction of all copies of the Program if FAA failed to abide by its terms.

In May 2004, AIS, through its quality control process, learned that an unauthorized user, Columbus Fair Auto Auction ("CFAA"), had made use of the Program using FAA's license. However, CFAA had previously contacted AIS with regard to possibly using the software and there is some suggestion that AIS authorized the use it now complains of. Nevertheless, AIS immediately issued a cease and desist letter pursuant to the license agreement, requiring FAA to stop use of the Program and return all copies to AIS. FAA agreed that it would be in the parties' best interest to terminate the agreement and complied with AIS's requests.

Following the end of the business relationship, AIS alleges that FAA continued to make use of the Program in violation of its copyrights. AIS has submitted an affidavit of a former FAA employee, Jacob Kniss. Mr. Kniss worked for FAA from 2001 to 2006 as an auto inspector, during which time he became familiar with the inspection software. Mr. Kniss stated that FAA's software is the same or substantially similar to the Program, and that FAA is still currently using a substantially similar program. *See* Kniss Aff. ¶¶ 2, 10.

FAA states that following the end of the business relationship with AIS, it set forth to develop its own inspection program to take the place of AIS's Program. FAA hired Technical Edge to develop the software and provided the programmers with GMAC's program requirements, and a description of FAA's needs. Technical Edge's designer, Randall Phillips, used the GMAC

3

requirements, FAA's needs, and their own in-house libraries as the basis for the software.

## B. The Testimony of Randall Phillips

At the November 30 hearing, Randall Phillips testified on behalf of FAA, where he is currently employed. Mr. Phillips has nearly 20 years of experience in computer programming, including experience with aviation electronics in the United States Navy. Prior to his employment at FAA, Mr. Phillips worked for Technical Edge, FAA's outside computer contractor, where he designed and wrote over 50 programs of varying degrees of complexity. Mr. Phillips explained that Technical Edge had a strict policy of not copying or pirating others' software or programs, which is considered highly unacceptable in the industry, and that he and others at Technical Edge followed this policy without fail.

In late March or early April of 2004, Mr. Phillips was assigned the task of designing and writing inspection software for FAA to use in connection with inspections for GMAC. Mr. Phillips was instructed to design the software from scratch, without regard for any current program or inspection process. Mr. Phillips specifically and adamantly testified that he had never seen AIS's Program or any of its source code prior to the commencement of this litigation. However, in connection with this case, Mr. Phillips did view a small portion of AIS's source code and was able to determine that it was written using the SQL computer language.

In order to begin designing FAA's software, Mr. Phillips participated in several meetings with FAA and GMAC, where the software's specifications were discussed and finalized.  Mr. Phillips stated that FAA's compatibility requirements, and GMAC's requirements for inspection processes and its integration manual dictated how the software needed to be written. Further, FAA's vehicle inspectors were consulted in order to determine the most logical, efficient, and user friendly

way to write the software. In this way the software's on-screen display and functionality would conform to all industry requirements and follow the normal and logical flow of a vehicle inspection.

Following the initial meetings, Mr. Phillips began writing the software in the computer language Visual Fox Pro, which he normally used. In light of the specifications, Mr. Phillips developed the framework for the program, integrating common utility functions used in all similar programs. Specifically, Mr. Phillips was able to use generic portions of Technical Edge's prior software that were necessary for the new program to function efficiently and be compatible with certain computer systems. However, Mr. Phillips stated that the vast majority of the software's content was dictated by GMAC's requirements, efficiency concerns, the needs of the actual vehicle inspectors, and common sense. For example, Mr. Phillips included drop-down displays which the vehicle inspector could click on while inspecting a vehicle in order choose from a list of possible descriptions for that vehicle. Mr. Phillips indicated that this was the most common way of collecting and displaying such information and, while other methods were available, they were not as efficient. Similarly, Mr. Phillips incorporated a widely used method, known as File Transfer Protocol ("FTP") for transferring the information from the inspector's computer to a central database.

Mr. Phillips tested the software and consulted with FAA and GMAC throughout the writing process. Mr. Phillips worked full time on this project and was able to complete the program for use in the field within 30 to 45 days. Mr. Phillips commented that despite the source code occupying well over 1000 written pages and having at least 20-30 on-screen displays, the software was relatively basic.

## C.  The Testimony of Jacob Kniss

Though AIS relies on Mr. Kniss's affidavit to support its motion, Mr. Kniss testified on

behalf of FAA at the hearing. Mr. Kniss worked for FAA for 5 years and eventually attained a supervisory position in its inspection business. Mr. Kniss is not a computer programmer and is not qualified to read, understand, or modify source code.

Mr. Kniss's testimony largely undermined the value of his affidavit to AIS. While the content of the affidavit was true, Mr. Kniss indicated that his statements were taken out of context. Essentially, reading the affidavit is akin to hearing one end of a telephone conversation. For example, Mr. Kniss's affidavit states "[f]rom November 2001 and for about 1.5 to 2 years thereafter, we used inspection techniques and data recordation that did not involve the use of software, as later utilized by FAA." *See* Kniss Aff. ¶ 2. The statement implies that FAA never used inspection software prior to its agreement with AIS; however, Mr. Kniss explained that FAA did use its own inspection software, but that his department at FAA, specifically the inspectors involved with GMAC, did not. Similarly, Mr. Kniss's affidavit states that around the time of FAA's agreement with AIS he "modified or had modified a software program for use on-site at FAA, at the direction of FAA management." *See id.* ¶ 3. The implication is that FAA instructed Mr. Kniss to alter AIS's software in some way; however, Mr. Kniss explained that his supervisors presented him with a paper copy of a computer screen display that was part of a computer program, and asked him to physically cut up the display and rearrange it in a way that he felt, based on his experience as a vehicle inspector, would be most logical. Thus this statement, in context, does not stand for the proposition that Mr. Kniss somehow modified AIS's software.

Finally, Mr. Kniss provided context for his opinion that FAA was using a program that was substantially similar to AIS's Program. Mr. Kniss stated that during a meeting with AIS, which he was led to believe could lead to an employment opportunity, AIS showed him two screens from its

Program and asked him if they looked like screens he had seen at FAA. Mr. Kniss candidly testified that the screens appeared similar, but that he did not mean to imply that because of the similarity FAA had copied AIS's program. In fact, Mr. Kniss further explained that the screens AIS showed him were indispensable to any vehicle inspection program, particularly a screen in which to input the vehicle identification number. Mr. Kniss also stated that as a vehicle inspector he would expect any program used in the field to conform to the natural flow of a vehicle inspection.

### III. LEGAL STANDARD

A court is to consider the following four factors in determining whether a plaintiff is entitled to a temporary restraining order or other preliminary injunctive relief:

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued;

(3) whether the issuance of a preliminary injunction will not cause substantial harm to third parties; and

(4) whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982); *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). The standard for preliminary injunction is not a rigid and comprehensive test, and the four factors are to be balanced, not prerequisites that must be satisfied, but instead "these factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.* 963 F.2d 855, 859 (6th Cir. 1992).

## IV.  ANALYSIS

### A.  Likelihood of Success on the Merits

"In deciding a motion for preliminary injunction ... the issue before the court is not whether infringement has been conclusively established as a matter of law, but rather whether the evidence upon such motion convinces the court that the plaintiff will likely prevail at trial." 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 14.06[A] (2006).

#### 1.  Copyright Infringement

In order to prevail on a claim of copyright infringement, the plaintiff must establish (1) an exclusive ownership in a valid, existing copyright,[1] and (2) the copying or other use of the copyrighted work by the defendant without the plaintiff's permission. *See Coles v. Wonder*, 283 F.3d 798, 801 (6th Cir. 2002). In order to demonstrate copying, the plaintiff must demonstrate both factual and legal copying. *See* 4 NIMMER ON COPYRIGHT § 13.01[B].  In other words, the plaintiff must show that its work was copied as matter of fact and that such copying is legally actionable. *See id.*

*i. Copying as a Matter of Fact*

To demonstrate copying as a factual matter, the plaintiff can either present direct evidence that the defendant copied or circumstantial evidence. *See id.* Typically, copying is shown circumstantially by demonstrating the defendant's access to the protected work and substantial similarity. *See id.* Access requires proof of a reasonable opportunity to view the work in question

---

[1]The parties do not contest this element for purposes of this motion. Interestingly, based on the analysis suggested by the Sixth Circuit in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), there is a chance that AIS's program could fail the threshold requirement of originality, and be wholly uncopyrightable. *See, e.g., Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991).

and, thus, an opportunity to copy. *See Small v. Exhibit Enterprises, Inc.*, 364 F.Supp.2d 648, 652 (E.D. Mich. 2005). As for substantial similarity, "when the question is copying as a factual matter, then similarities that, in the normal course of events, would not be expected to arise independently in the two works are probative of defendant's having copied as a factual matter from plaintiff's work." 4 NIMMER ON COPYRIGHT § 13.01[B].

AIS's showing of copying as a factual matter is weak. While FAA certainly had access to the Program in that it was allowed to use it via the licensing agreement, there is little evidence that FAA had access to the source code of the program. The source code is the software's structural blue print, "a written language that the computer can read" and is the basis for the copyright. *See Computer Associates Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2nd Cir. 1992). At the hearing, AIS presented testimony from Vladimir Mitic, one of its software engineers, who stated that the source code could be accessed through the computer on which the Program is loaded. However, Mr. Mitic did not work for AIS while FAA was in possession of any of AIS's computers. His testimony only related to a similar computer that AIS used at the hearing, and he could not have personal knowledge of the accessibility features on the computers FAA actually possessed.

As further evidence of access, AIS relies on the fact of the licensing agreement and Mr. Kniss's affidavit. As stated, the fact of the licensing agreement shows only that FAA had the actual program, but not access to the source code. Furthermore, Mr. Kniss's testimony at the hearing largely undermined any probative worth AIS placed on his affidavit. When placed in the proper context, the affidavit does not stand for any of the propositions AIS suggests. More importantly, Mr. Kniss stated that he was not capable of understanding or accessing the Program's source code. Finally, Mr. Phillips, who developed the allegedly infringing software, had never seen AIS's

Program or its source code. Thus there is little evidence FAA had access to the source code.

Assuming FAA did have access to the source code, there is no evidence that the alleged infringing program is substantially similar to AIS's Program. Mr. Phillips' testified that he wrote FAA's software in a different computer language, Visual Fox Pro, and relied on independent sources of information. Furthermore, both programs were designed to conform to GMAC's specific guidelines. Consequently, it is not unlikely that the two separate programs would appear similar on screen or use similar terminology for vehicle inspection. This is especially true in the present case because GMAC dictated that all of its inspectors' programs meet specific functionality requirements. In particular, GMAC's integration manual and inspection guidelines clearly outline the vehicle inspection process and the terms and definitions inspectors are expected to use in reporting the inspection data to GMAC. These terms include commonly used words for describing various parts of a used vehicle, such as dent, scratch, tear, etc. Moreover, based on the needs of the industry, the fact that two programs used for the same purpose have similar screen displays is not unlikely at all. Therefore, any similarity in the present case indicates independent design as much as it does copying.

Finally, AIS suggests that because FAA was able to write an inspection program in a shorter time than AIS, FAA must have copied. However, AIS bases this inference on the testimony of its President, Robert Trickey, who has no specialized knowledge of computer programming. In contrast, Mr. Phillips provided credible testimony that he completed FAA's program in 30 to 45 days. In light of Mr. Phillips specialized knowledge, the Court finds AIS's suggestion of copying is without merit. Consequently, AIS has not made a sufficient showing of factual similarity to demonstrate a strong likelihood of success on the merits.

### ii. Copying as a Matter of Law

Assuming further that AIS can demonstrate factual copying, it must still demonstrate that the copying was actionable. "It is a fundamental principle of copyright law that a copyright does not protect an idea, but only the expression of an idea." *Altai*, 982 F.2d at 703. This principle is set forth in § 102(b) of the Copyright Act which states:

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b). This section makes clear "that the expression adopted by the [computer] programmer is the copyrightable element in a computer program, and that the actual processes or methods embodied in the program are not within the scope of copyright law." *Altai*, 982 F.2d at 703 (*quoting* H.R. REP. NO. 94-1476, at 54 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5670).

In the context of computer programming, legal copying requires a rigorous analysis. The leading case is *Computer Associates Int'l, Inc. v. Altai, Inc.*, which set forth the successive filtration analysis for distinguishing between unprotectable ideas and protectable expression advanced by Professor Nimmer in his treatise. *See* 4 NIMMER ON COPYRIGHT § 13.03[F].

> [W]e think that district courts would be well-advised to undertake a three-step procedure ... in order to determine whether the non-literal elements of two or more computer programs are substantially similar. This approach breaks no new ground; rather, it draws on such familiar copyright doctrines as merger, *scenes a faire*, and public domain.
>     In ascertaining substantial similarity under this approach, a court would first break down the allegedly infringed program into its constituent structural parts. Then, by examining each of these parts for such things as incorporated ideas, expression that is necessarily incidental to those ideas, and elements that are taken from the public domain, a court would then be able to sift out all non-protectable material. Left with a kernel, or possible kernels, of creative expression after following this process of elimination, the court's last step would be to compare this material with the structure of an allegedly infringing program. The result of the

11

>comparison will determine whether the protectable elements of the programs at issue are substantially similar so as to warrant a finding of infringement.

*Id.* at 706. The Sixth Circuit adopted this method of analysis in *Kohus v. Mariol*, 328 F.3d 848, 855 (6th Cir. 2003), combining the first two steps from *Altai* into one.

The doctrines of merger, *scenes a faire*, and public domain limit the portions of the Program that are protected. *See id.*; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2005). *See also* 4 NIMMER ON COPYRIGHT § 13.03[F]. "Where the expression is essential to the statement of the idea, or where there is only one way or very few ways of expressing the idea, the idea and the expression are said to have merged." *Lexmark*, 387 F.3d at 535. (internal citations and quotations omitted). This is because to extend copyright protection to the expressive components would necessarily give protection to the unprotectable ideas also. *See id.*

External factors also narrow the scope of copyright protection under the doctrine of *scenes a faire*. "In the computer software context, the doctrine means that the elements of a program dictated by practical realities–e.g., *by hardware standards, and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices, and standard computer programming practices*–may not obtain protection." *Id.* at 535 (emphasis added). Efficiency, as a fundamental goal of computer programmers, "represents an external constraint that figures prominently in the copyrightability of computer programs." *Id.* at 536 (*citing Altai*, 982 F.2d at 708). Finally, those elements that are in the public domain are unprotectable.

In the present case, AIS's contention that FAA's allegedly infringing program is substantially similar to the Program is supported only by conclusory assertions and Mr. Kniss's affidavit. This evidence is not sufficient to demonstrate that there is any legal similarity between the

two programs. As discussed above, the affidavit is clearly lacking in probative value on this issue. Mr. Kniss did not have the specialized knowledge to analyze computer programs and make meaningful comparisons. To the contrary Mr. Kniss only states that the programs' screen displays were similar. Moreover, AIS has not made any attempt to abstract or break down the Program into its constituent parts to show that they are in fact copyrightable.

In contrast to AIS's evidence, FAA has presented evidence that GMAC's requirements dictated exactly what the programs were to do and look like. Even more compelling was Mr. Phillips' testimony that other external factors such as efficiency, hardware standards, compatibility requirements, and ease of use seriously limit the ways in which vehicle inspection software can be written.

Finally, assuming there is some part of the Program that is copyrightable, that portion must be compared to FAA's allegedly infringing program to determine substantial similarity. The Sixth Circuit has determined that this comparison should be made by the work's intended audience. *See Kohus*, 328 F.3d at 857. Thus in the context of computer source code, this comparison should be made by a person with specialized knowledge in computer programming. *See id.* Accordingly, Mr. Kniss's comparison cannot be used to make the determination of substantial similarity. Furthermore, Mr. Phillips stated that the allegedly infringing program was written in a completely different language drawn from stock sources and based on GMAC's mandates. Therefore, the record to date indicates that the programs are not substantially similar.

### 2. Digital Millennium Copyright Act

AIS asserts that it has a substantial likelihood of success on the merits of its claim under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et seq*. Section 1201(a)(1) of the

DMCA states that "no person shall circumvent a technological measure that effectively controls access to a work protected under this title." Circumventing a technological measure means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise bypass, remove, deactivate, or impair a technological measure, without authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A). A technological measure effectively controls access to the work "if the measure in the ordinary process of its operation, requires the application of information or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). The effectiveness test is met if the technological measure actually works to control access. *See Universal City Studios v. Reimerdes*, 111 F.Supp.2d 294, 318 (S.D. N.Y. 2000).

As an initial matter, it is questionable that AIS's user detection feature constitutes a technological measure that controls access to a protected work. The protected work in this case is the source code of the Program. The user detection feature is a part of the program itself and in no way controls access to the source code; rather, it merely alerts AIS as to who is using the Program. Consequently, the user detection feature would not prevent anyone from gaining access to the source code and copying it verbatim. *See, e.g., Lexmark*, 387 F.3d at 549 ("Because Lexmark has not directed any of its security efforts, through its authentication sequence or otherwise, to ensuring that its copyrighted work (the Printer Engine Program) cannot be read and copied, it cannot lay claim to having put in place a 'technological' measure that effectively controls access to a work protected under [the copyright statute]."). Moreover, this feature only comes into play after a user has conducted an inspection, and does not prevent unauthorized users from accessing the Program.

Notwithstanding the applicability of the DMCA, there is no evidence that FAA circumvented a technological measure to gain access to AIS's work. AIS contends that Mr. Kniss was instructed

to alter a program so that FAA could use it. However, Mr. Kniss clearly testified that he did no such thing. Mr. Kniss stated that his supervisors presented him with printouts of a computer screen; that is, actual pieces of paper that portrayed an inspection program. The supervisors then asked him to rearrange the aspects of the onscreen display in a manner that he thought, based on his experience as a vehicle inspector, would be the most logical and easy to use for other inspectors. To do so, Mr. Kniss actually cut the pages with scissors, rearranged the pieces, and pasted them back together. Thus, Mr. Kniss did, in one sense, alter a program. However, there is no doubt that Mr. Kniss did not access the Program's source code, modify it in anyway, or help FAA to create a derivative program. Mr. Kniss clearly acknowledged that he was neither qualified not capable of rewriting or altering software.

Further, AIS argues that the fact that it stopped receiving information regarding FAA's inspections demonstrates that FAA must have circumvented the user detection feature. However, FAA's programmer, Mr. Phillips, stated that he had never seen the Program or its source code, and that he independently wrote a separate program. This version of events explains how FAA continued to inspect cars without AIS finding out just as well as if FAA had altered the Program in some way to escape detection. Thus, AIS has not shown a strong likelihood of success under the DMCA.

**B.  Irreparable Harm to AIS**

In cases of copyright infringement, once a plaintiff has shown a reasonable likelihood of success on the merits, it is entitled to a presumption that it has suffered irreparable harm. *See Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 267 (6th Cir. 1988). Based on AIS's weak showing, it should not be entitled to this presumption. Because it relies on the presumption, AIS has devoted little discussion to the issue. Basically, AIS asserts that it has lost a substantial amount of business due

to the unauthorized use of the program. Further, AIS states that there is a risk FAA would conceal or destroy evidence.

However, as FAA states, the fact that AIS lost business cannot be directly linked with any unauthorized use. AIS simply asserts in a conclusory manner that FAA infringed and, because of the infringement, has been able to steal business away from AIS. Yet it is just as likely that FAA developed a program that could perform the same function as AIS's, and GMAC chose to do business with other companies. Furthermore, there is no indication that FAA would conceal evidence. Finally, AIS first suspected infringement in 2004, yet waited over 2 years to seek a TRO. Thus, this factor does not weigh in favor of granting an injunction.

**C. Harm to FAA**

A copyright infringer has no legitimate interest in continuing to break the law and cannot argue that its business would be harmed by enforcing a valid copyright. *See Worlds of Wonder v. Veritel Learning Systems*, 658 F.Supp. 351, 357 (N.D. Tex. 1986). Since it is not at all clear whether FAA infringed on AIS's copyright, the possible harm to FAA's business strongly militates against issuing an injunction.

FAA's principal source of business, GMAC, requires that inspection software be updated regularly. The next scheduled update is December 1, 2006, the day after the hearing. Mr. Phillips testified that based on his understanding of GMAC's updated schedule, FAA's software needs to conform to GMAC's requirements by December 1, 2006. If the Court were to grant a preliminary injunction, FAA would be prevented from updating its software and thereby prohibited from conducting inspections for GMAC. This would be disastrous for FAA. Furthermore, if the Court were to permit AIS to seize computers and equipment for inspection, FAA would be effectively put

out of business. The record clearly does not justify such an extreme measure, and the harm to FAA if an injunction is issued outweighs the harm to AIS in the absence of an injunction.

**D.  Public Interest**

"[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983). However, since AIS has not met its burden to demonstrate either a likelihood of success on the merits or irreparable harm, and issuing an injunction would essentially ruin a large local employer, the public interest also weighs in favor of not issuing an injunction. Therefore, this factor does not favor either party.

## V.  CONCLUSION

The record does not demonstrate that AIS has a strong likelihood of success on the merits. Further, AIS, without the benefit of a presumption, has not demonstrated that it will be irreparably harmed if an injunction is not issued. On the other hand, issuing an injunction could seriously harm FAA's business. Consequently, FAA has shown good cause as to why the Court should not grant a preliminary injunction. Accordingly,

IT IS ORDERED that the Temporary Restraining Order issued November 15, 2006, is HEREBY DISSOLVED.

IT IS FURTHER ORDERED that AIS's Motion for a Preliminary Injunction is DENIED.

IT IS SO ORDERED.

Date: December 4, 2006

s/Lawrence P. Zatkoff  
LAWRENCE P. ZATKOFF  
UNITED STATES DISTRICT JUDGE